Judgment rendered May 26, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,872-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

RODERICK SANDERS ON BEHALF OF
HIMSELF AND A CLASS OF SIMILARLY
SITUATED LOUISIANA RESIDENTS                    Appellees

versus

CITY OF WINNFIELD                               Appellants

* * * * *

Appealed from the
Eighth Judicial District Court for the
Parish of Winn, Louisiana
Trial Court No. 45347

Honorable Jacque Derr, Judge

* * * * *

| | |
|---|---|
| PETTIETTE, ARMAND, DUNKELMAN, WOODLEY, BYRD & CROMWELL, L.L.P. By: Edwin H. Byrd, III    Marshall L. Perkins | Counsel for Appellants, City of Winnfield and The Charter Oak Fire Insurance Company |
| LAW OFFICES OF HALES & STRICKLAND By: Myrt T. Hales, Jr.    Joshua L. Strickland | Counsel for Appellees |

* * * * *

Before MOORE, COX, and THOMPSON, JJ.

**COX, J.**

This civil suit arises from the 8th Judicial District Court, Winn Parish, Louisiana, the Honorable Judge Jacque Derr presiding. The City of Winnfield ("the City"), the defendant in this matter, appeals from, and seeks review of a trial court judgment certifying a putative class action filed by Roderick Sanders ("Mr. Sanders") individually and on behalf of other similarly situated persons residing in southwest Winn Parish in April 2017. For the following reasons, we reverse the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

On June 5, 2017, Mr. Sanders individually and on behalf of the residents of southwest Winn Parish instituted this action with the filing of a class action petition for damages against the City.[1] The initial petition named Mr. Sanders as an individual who purported to represent a class of persons similarly situated, *i.e.*, those persons within a residential neighborhood in southwest Winn Parish who sustained damage as a result of flood waters. On behalf of the putative class, Mr. Sanders alleged that the City of Winnfield failed to uphold its duties as a Louisiana municipality to properly design, construct, and maintain the drainage facilities within its jurisdictional limits; particularly, those facilities in and throughout this area.

According to Mr. Sanders, he and the residents sustained severe damage from floodwaters after a rainstorm on April 30, 2017,[2] as a direct

---

[1] The Charter Oak Fire Insurance Company ("Charter Oak"), the City's insurer, is also named as a defendant in this suit and is represented by the same counsel. Charter Oak likewise opposed the court's grant of class certification and joins the City in this appeal.

[2] A weather report, included in Mr. Vanderbrook's assessment of the area, indicated the neighborhood received approximately five to ten inches of rain on the date in question.

result of the City's failure to adequately maintain the drainage facility in this neighborhood. The petition listed the sustained damages suffered as damage to property, loss of use, inconvenience, aggravation and distress, and health hazard(s). Mr. Sanders sought further damages pursuant to the Equal Protection Clause, 42 U.S.C. §1981, and the La. Constitution, 42 U.S.C. §1983. He maintained that the City systematically and intentionally discriminated against him and the residents in this area because its drainage and land use policies did not protect the property or provide adequate drainage throughout this area. In particular, the City's drainage practices resulted in varying degrees of quality of municipal services and facilities throughout the residences, prioritizing predominately white neighborhoods to the detriment of his own neighborhood, which was predominately African American.

The City removed this matter to the United States District Court for the Western District of Louisiana. The federal court dismissed, without prejudice, Mr. Sanders's federal claims of equal protection violations, finding that he failed to adequately allege an unconstitutional policy of the City or that he, as a member of the protected class, was treated differently than other similarly situated persons outside of the class. The remaining negligence claims under state tort law were remanded to the district court. The petition was subsequently amended to exclusively assert a claim of negligence against the City for failure to adequately design, construct, and maintain its drainage facilities. The petition stated that the class's geographic area, or "area of flooding," was located "on the west side of Highway 34 and south of West

2

Court Street, east of Pine Ridge Country Club, and north of Country Club Road."

Regarding the location, function, and condition of the drainage system after the City installed culverts and catch basins,[3] and prior to the rainstorm on April 30th, Mr. Sanders attached the opinion of engineer, Kevin C. Vanderbrook ("Mr. Vanderbrook"). The report provided:

> The drainage system in the area is located on the south side of the east/west railroad tracks and on the west side of Highway 34. A drainage canal passed under Highway 34 immediately south of the railroad tracks and this served as the termination point for the watershed which drained the adjacent neighborhood. The system is designed so that the water will drain by means of a two-box culvert under the highway with an additional round culvert. The two openings of the box culvert measure approximately ten (10) feet by ten (10) feet and are located on the east side of a large creek bank which has been partially paved to prevent erosion. On the west side of the creek bank near the highway there is a round culvert which measures approximately five (5) feet in diameter which serves as the termination point for the drainage system of the original Creosote Creek watershed.
>
> The termination of the end round culvert is in extremely bad condition with extensive long-term deterioration to the bottom of the metal culvert. The culvert had originally been asphalt coated but the asphalt has deteriorated to the point where the metal has rusted away, creating an opening along much of the culvert. The culvert has corroded and slumped downward, decreasing the cross-sectional area. Within the culvert system there is widespread deterioration of the drainage pipes though the system with significant corrosion and deterioration to the bottom of the culvert in virtually every section of the pipe, creating both a path for erosion of [soil] and introduction of debris into the pipe. Further, virtually all of the culvert pipe joints were deteriorated and allowed erosion and intrusion of debris into the culvert system.
>
> The culvert pipe extends in a westward direction from Highway 34 approximately one-half (1/2) mile with various branches to secondary culverts and catch basins. There are

---

[3] Mr. Sanders's petition specified that approximately 20 years before the storm in 2017, the City installed culverts along Creosote Creek, which ran through the area, in an attempt to improve the drainage in the defined area.

3

numerous locations with widespread deterioration of the culvert pipes, widespread intrusion of debris, deterioration of joints and culvert pipes, and significant sloughage and erosion of soil into the culvert system, creating bypasses around the catch basins. In many areas the soil has eroded significantly around the catch basins due to a hole or opening into the culvert pipe and water bypasses the catch basins into the eroded soil area and enters the system through deterioration of either joints or pipes.

Mr. Sanders further alleged that the City's negligence in the construction, maintenance, and repair of the drainage system was a direct cause of the continual flooding in the area and the damage sustained to the land and property of those persons who lived, worked, and owned property in the area. In particular, it was alleged that the City was negligent in:

1) Failing to maintain the drainage system in a reasonable manner;
2) Failing to maintain the east side of Highway 34 by allowing trees, shrubbery, and debris to block the flow of water downstream;
3) Failing to maintain the catch basins within the system;
4) Failing to maintain the culverts within the system;
5) Failing to protect its citizens from storm waters despite taking on the responsibility. . . twenty (20) years ago;
6) Failing to maintain its drainage systems to be able to withstand expected amounts of rainfall;
7) Failing to repair the system despite having knowledge of its poor condition;
8) Failing to remove the system despite having knowledge of its poor condition; and
9) *Res Ipsa Loquitur*.

In support of these allegations, Mr. Sanders relied on Mr. Vanderbrook's opinion after the drainage system was inspected on October 7, 2017. Mr. Vaderbrook opined, *in brevi*, that the flooding on April 30, 2017, was caused by the City's "widespread neglect." Particularly, that the deterioration of the drainage system and underground culvert pipes reduced drainage capacity, causing significant safety hazards throughout, and that overgrown vegetation

significantly restricted runoff, elevating the water level and flooding nearby homes.

On March 9, 2018, Mr. Sanders filed a motion for class certification, requesting that the trial court certify the class for prosecution of claims against the City. In a supplemental memorandum on behalf of and in support of the motion, Mr. Sanders claimed that the requirements for class certification were satisfied under La. C. C. P. art. 591(A), and attached a copy of a preliminary engineering report prepared by Oscar J. Boudreaux ("Mr. Boudreaux") for the City in 2013.[4] Mr. Sanders argued that the report supported class certification because it acknowledged that the drainage system and structure were located in a densely populated area with numerous homes on each block, and that the deterioration of the system and its structures was a hazard and liability to both persons and property.

On March 2, 2020, a contradictory hearing was held in the trial court on the motion to certify the class action. The trial court requested both parties to brief the application of *Brooks v. Union Pac. R.R. Co.*, 2008-2035 (La. 5/22/09), 13 So. 3d 546, and took the issue under advisement. Thereafter, the trial court granted the motion to certify the class action on March 17, 2020, and issued supplemental written findings of fact and reasons for judgment on June 24, 2020. In its stated reasons, the court provided:

> The Class Area is defined as those properties located in the City of Winnfield, Winn Parish, Louisiana, bounded on the North by the railroad tracks; on the East by Highway 34; on the South by West Jones Street; and on the West by Patton Street.

---

[4] The preliminary engineering report was prepared by Environmental Engineering Services, Inc. in May 2013. The report refers to the geographic area of the class as the Orange Street Drainage System. It detailed, in full, an evaluation of the capabilities and physical characteristics of the drainage system in southwest Winnfield in 2013.

The class will be those persons residing or owning property within the Class Area on or about April 30, 2017, who suffered property damage as a result of flooding which occurred in the Class Area on or about April 30, 2017.

It is clear from the reports of the two experts that the area of the alleged flooding is populated with numerous houses or other structures. Joinder of all class members under these circumstances is impractical.

There are common issues of law and fact common to the class. In particular, the Court notes that the major issue common to the class would be whether the City of Winnfield failed to properly design, construct, and maintain the drainage system for the neighborhood resulting in flooding of the neighborhood on or about April 30, 2017.

The claims or defenses of the representative parties for property damage caused by the flooding are typical of the claims or defenses of the class.

The Court also finds that the plaintiff in this matter and his counsel will adequately protect the interests of the class.

The Court further finds that the plaintiff has satisfied the conditions of Code of Civil Procedure Article 591(B)(3). All of the proposed class claims are based on the actions and/or inactions of the defendant and all of the damages resulted from the same occurrence which took place on or about April 30, 2017. The Court believes that class action is particularly appropriate in this case in that many of the class members may have no value claims which could not be pursued absent class certification. The class action is the only efficient and viable method of adjudicating the claims in this case.

In short, the Court finds that the persons affected are too numerous and [it] is impracticable to bring individual suits. In addition, many of the class may be too poor and their claims too small to litigate individually. Therefore, class action treatment is certainly appropriate in this case.

The City now appeals.

## DISCUSSION

On appeal, the City argues that the trial court erred in certifying the class in this matter because Mr. Sanders and the residents failed to satisfy any of the requirements to certify a class of mass tort plaintiffs as set forth in La.

C. C. P. art. 591. For the following reasons, we find merit in this assignment of error.

It is well-established law that a class action is a nontraditional litigation procedure that permits a representative with typical claims to sue or defend on behalf of, and stand in judgment for, a class of similarly situated persons when the question is one of common interest to persons so numerous as to make it impracticable to bring them all before the court. Its purpose and intent is to adjudicate and obtain a *res judicata* effect on all common issues applicable not only to persons who bring the action, but also to all others who are "similarly situated." *Baker v. PHC-Minden, L.P.*, 2014-2243 (La. 5/5/15), 167 So. 3d 528; *Dupree v. Lafayette Ins. Co.*, 2009-2602 (La. 11/30/10), 51 So. 3d 673; *Reeves v. Explo Systems, Inc.*, 53,219 (La. App. 2 Cir. 3/4/20), 293 So. 3d 119.

Because class actions are an exception to the general rule that litigation must be conducted by and on behalf of the individually named parties only, the determination of whether a class action satisfies the requirements imposed by law involves a rigorous analysis. As such, the trial court must evaluate, quantify, and weigh the relevant factors to determine to what extent the class action would, in each instance, promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness. *Baker v. PHC-Minden*, *L.P.*, *supra*; *Dupree v. Lafayette Ins*. *Co*., *supra*. The court must actively inquire into every aspect of the case and not hesitate to require showings beyond the pleadings because it must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a

meaningful determination of the certification issues. *Baker v. PHC-Minden, L.P., supra.*

Any errors to be made in deciding class action issues should be in favor of and not against the maintenance of the class action, because a class certification order is always subject to modification or decertification, if later developments during the course of the trial so require. *Baker v. PHC-Minden, L.P., supra.* However, this general rule should not be used as a substitute for the rigorous analysis required to determine whether the prerequisites of Louisiana's class action provisions have, in fact, been satisfied. *Price v. Martin*, 2011-0853 (La. 12/6/11), 79 So. 3d 960. Accordingly, the trial court should evaluate the case closely before certifying the class in light of the consequent burdens of giving notice and additional discovery. *Baker v. PHC-Minden, L.P., supra*; *Dupree v. Lafayette Ins. Co., supra.* In the review of a trial court's judgment on class certification, its factual findings are subject to a manifest error standard, such that it can only be reversed upon finding that no reasonable factual basis exists for the factual finding and the factfinder is clearly wrong. *Stobart v. State, through Dept. of Transp. & Dev.*, 617 So. 2d 880 (La. 1993). However, the court's ultimate decision regarding whether to certify the class is reviewed under the abuse of discretion standard.

La. C. C. P. art 591 sets forth five threshold prerequisites for class certification as follows:

> A. One or more members of a class may sue or be sued as representative parties on behalf of all, only if:
>
> (1) The class is so numerous that joinder of all members is impracticable.
> (2) There are questions of law or fact common to the class.
> (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.

8

(4) The representative parties will fairly and adequately protect the interests of the class.

(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case. This prerequisite shall not be satisfied if it is necessary for the court to inquire into the merits of each potential class member's cause of action to determine whether an individual falls within the defined class.

Each of these requirements must be met for an action to be maintained as a class action; failure to meet one of these threshold requirements precludes class certification. La. C.C.P. art. 591(B)*; Doe v. Southern Gyms, LLC*, 2012-1566 (La. 3/9/13), 112 So. 3d 822, 828. The burden of proving that the statutory class certification criteria have been satisfied in full falls upon the party seeking to maintain the class action. *Dupree v. Lafayette Ins. Co., supra*; *Marsh v. USAgencies Cas. Ins. Co.*, 42,176 (La. App. 2 Cir. 5/16/07), 957 So. 2d 901, *writ denied*, 2007-1286 (La. 10/26/07), 966 So. 2d 575; *Howard v. Willis-Knighton Med. Ctr.*, 40,634 (La. App. 2 Cir. 3/8/06), 924 So. 2d 1245, *writ denied*, 2006-0850 (La. 6/14/06), 929 So. 2d 1268, and *writ denied*, 2006-1064 (La. 6/14/06), 929 So. 2d 1271.

Once the five prerequisites have been satisfied, La. C.C.P. art. 591(B) provides three additional criteria, one of which must also be satisfied for certification, depending on the type of class action sought. *Baker v. PHC-Minden, L.P., supra*; *Dupree v. Lafayette Ins. Co., supra*. Often, the additional requirement that must be met for certification is set forth in La. C.C.P. art. 591(B)(3), which provides:

> The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:

9

(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;
(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(c) The desirability or undesirability of concentrating the litigation in the particular forum;
(d) The difficulties likely to be encountered in the management of a class action;
(e) The practical ability of individual class members to pursue their claims without class certification;
(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation.

However, class "certification shall not be for the purpose of adjudicating claims or defenses dependent for their resolution on proof individual to a member of the class." La. C. C. P. art. 591(C); *Baker v. PHC-Minden*, *L.P.*, *supra*. Nevertheless, where certification is maintained, "the court shall retain jurisdiction over claims or defenses dependent for their resolution on proof individual to a member of the class."

We note that this appeal does not encompass the merits of Mr. Sanders's claim, but is instead limited to a review of the trial court's certification of the class.

*Commonality*

The commonality requirement for class certification requires a party seeking class certification to show that there exist questions of law or fact common to the class. See La. C. C. P. art 591(A)(2). The mere existence of common questions alone, however, will not satisfy the commonality requirement because "[a]ny competently crafted class complaint literally raises common questions." *Price v. Martin*, *supra*. Rather, this element requires a party seeking certification to demonstrate the class members'

10

claims depend on a common contention, and that common contention must be one capable of classwide resolution, or "one where the 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.' " *Baker v. PHC-Minden*, *L.P.*, *supra*; *Price v. Martin*, *supra*.

Therefore, to satisfy this requirement, there must exist a common nucleus of operative facts. A common question is one that, when answered as to one class member, is answered as to all of them. *Price v. Martin, supra*; *Dupree v. Lafayette Ins. Co., supra*; *Smith ex rel. Upchurch v. McGuire Funeral Home, Inc.*, 46,326 (La. App. 2 Cir. 6/1/11), 70 So. 3d 873, *writ denied*, 2011-1419 (La. 9/30/11), 71 So. 3d 290, and *writ denied*, 2011-1454 (La. 9/30/11), 71 So. 3d 297. As part of the analysis for commonality and predominance in mass tort cases, it has been determined that only mass torts which arise from a common cause or disaster may be appropriate for class certification. Causation is a crucial part of determining liability and, if causation is not the same for each potential class member, individual trials on causation would be required, which would defeat the purpose of the class action device. *Brooks v. Union Pac. R.R. Co.*, *supra*.

This does not, however, require that the amount or extent of damages sustained be common to all class members. The mere fact that varying degrees of damages can result from the same factual transaction and legal relationship or that class members must individually prove their right to recover, does not preclude class certification. *Brooks v. Union Pac. R.R. Co., supra*; *Reeves v. Explo Systems, Inc.*, *supra*; *Bartlett v. Browning-Ferris Industries Chem. Servs., Inc.*, 99-0494 (La. 11/12/99), 759 So. 2d 755. In

11

order to meet the common cause requirement, each member of the class must be able to prove individual causation based on the same set of operative facts and law that would be used by any other class member to prove causation. *Price v. Martin, supra; Brooks v. Union Pac. R.R. Co., supra.* To satisfy the commonality requirement, Mr. Sanders was required to show that the claims asserted arose from a common cause or disaster and that causation was the same for all class members with the same set of operative facts and law.

The trial court found that the common issue as to the class was whether the City failed to properly design, construct, and maintain the drainage system for the neighborhood, resulting in flooding and subsequent damage to property. Mr. Sanders argues that the trial court correctly determined the common issue central to the class. He argues that the class should be certified on the basis of commonality because all of the claims are based on the same legal theory- the City's failure to adequalety design, construct, and maintain the drainage system for this area and that the damages sustained were from the same event, the rainstorm on April 30, 2017.

Mr. Sanders argues that the findings of both reports indicated that the area in question is encompassed by a single drainage system that impacts the entire area and that the cause of the flooding in the area was due to 1) the drainage system's inadequate ability to export run-off water and 2) the widespread neglect and deterioration of the drainage system. Mr. Sanders asserts that each affected home sustained damage as a result of this one system because it was deteriorated, eroded, and that all catch basins were overgrown and blocked with debris. He argues that each of these causes is uniform to the area and those who sustained damage.

Regarding the City's failure, Mr. Sanders attempts to distinguish the present case from that of *Brooks v. Union Pac. R.R. Co.*, *supra,* in which the plaintiffs alleged that the city and the railroads failed to design and maintain box culverts and as a result, their homes were damaged during a flood. The plaintiffs argued that because the actions of the city and the railroad caused water levels to rise in all of the drainage basins, the only factor left to be determined was the amount of water each home received.

The Louisiana Supreme Court affirmed the decertification of the class. It noted that "the cause of the flooding must be the same for each member of the class, and if there is more than one cause of flooding, each of these causes must be the same for each class member." *Brooks v. Union Pac. R. R. Co., supra*. The Court observed that the plaintiffs in this case resided in three different watersheds or basins, the cause of the flooding varied from basin to basin, and any secondary causes of flooding damages, such as elevation, would vary depending on specific property conditions. *Id*. In addition, there were multiple defendants whose collective actions contributed to the damage sustained. *Id*. Accordingly, the Court concluded that in a mass tort case involving more than one defendant, more than one cause, and more than one theory of liability, class action would not be an appropriate mechanism. *Id*.

Here, Mr. Sanders argues that unlike *Brooks v. Union Pac. R.R. Co., supra*, there is only one defendant, the City, whose actions or inactions created one set of circumstances which injured all of the class members. Additionally, because the "neighborhood slopes on the west towards the east, and from both the north-to-south, and south-to-north forming a three-sided bowl that discharges at the far east," the injured all reside within a single

watershed or basin so that there is only one common cause for the flood. However, after a review of the record, we find that commonality has not been established because there were multiple contributing factors within the drainage system as well as secondary causes for the flooding.

Mr. Boudreaux's report indicated that this area is located on a slope encompassed by a single drainage system. Importantly, he indicated that the system is composed of two distinct tributaries that each branch throughout the area, leading to different culverts or catch basins at different locations in the area. Further, Mr. Vanderbrook, who physically entered the system at various locations, reported the following:

> [F]looding in the neighborhood on April 30, 2017, was caused by widespread neglect and deterioration of the storm water drainage system. . . Virtually all of the catch basins were either overgrown with vegetation, or blocked with debris. . . In addition, widespread deterioration. . . has allowed significant erosion of debris and soil into the system which reduced the drainage capacity. . . Overgrown vegetation on the east side of Hwy 34 also significantly restricts runoff on the downstream side of the system and causes water to back up throughout the system. . .

The report also indicated that while there was soil erosion around some culverts, others were deteriorated or blocked by debris or vegetation; that some catch basins were overgrown with vegetation, others at different locations were blocked with debris, while still some other were blocked by both debris and an overgrowth of vegetation. Moreover, Mr. Sanders acknowledged that there were multiple causes for the flooding: "deteriorated drain system, all catch basins being overgrown and blocked with debris, erosion reducing drainage capacity, overgrown vegetation in the stream on the east side of Highway 34, etc." Based on the information provided in the reports, we conclude that there are simply too many different factors and

14

causes which impact this system to determine that there is only one single common cause.

The Supreme Court in *Brooks v. Union Pac. R.R. Co.*, *supra*, stated that if "there is more than one cause of flooding, each of these causes must be the same for each class member." It cannot be said that the resolution of whether the City failed to properly design, construct, and maintain the drainage system for the neighborhood would be the same as to each potential class member because there are multiple alleged failures within the system making causation different for each individual.

Mr. Sanders stated that he and another neighbor who lived a few blocks over had to remove *debris* from their catch basin, otherwise storm water would not drain; notably, Mr. Sanders did not testify that any other neighbor complained of an overgrowth in vegetation preventing water from draining properly. From this, it can be concluded that the cause of any particular home flooding could be any combination of factors: its location on the slope of the area; whether it is near a culvert that was eroded; or whether a particular catch basin in its area was either overgrown with vegetation, blocked with debris, or a combination of both.

Therefore, we find that the trial court erred in finding that there were common questions of law and fact in this matter sufficient to certify the class action. As stated previously, all five prerequisites of La. C.C.P. art 591(A) must be satisfied to certify a class action. Thus, the failure to satisfy the commonality requirement precludes class certification.

*Numerosity and Joinder*

15

Numerosity, as set forth in La. C.C.P. art. 591(A)(1), is based on the facts and circumstances of a particular case. This requirement reflects the basic function of a class action as a device for allowing a small number of persons to protect or enforce rights or claims for the benefit of many where it would be inequitable and impracticable to join every person sharing an interest in the rights at issue in the suit. *Baker v. PHC-Minden*, *L.P.*, *supra*. Although there is no strict numerosity threshold, this element does require more than just the mere allegation that a large number of potential claimants exist. However, it is not required to identify every member of the potential class prior to certification. *Doe v. Southern Gyms, LLC, supra.*

While the determination of numerosity is, in part, based upon the number of putative class members, it is also based upon considerations such as the geographic dispersion of the class; the ease of identification of the class; the nature of the action; the size of the individual clams; the financial resources of class members; and judicial economy in avoiding a multiplicity of lawsuits. *Doe v. Southern Gyms, LLC, supra; Galjour v. Bank One Equity Investors-Bidco, Inc*., 2005-1360 (La. App. 4 Cir. 6/21/06), 935 So. 2d 716. Therefore, to satisfy this requirement, the plaintiff must show that joinder is impracticable, yet, there is a definable group of aggrieved persons. *Baker v. PHC-Minden*, *L.P.*, *supra*; *Doe v. Southern Gyms, LLC, supra.*

From the findings of Mr. Boudreaux's report, Mr. Sanders maintains that the area, which is encompassed by the drainage system, is densely populated and inundated with homes and other residential properties that were each impacted by the same system. Within each home, he argues that there likely to reside multiple people who would each have separate and individual

16

claims against the City for flood damage. Therefore, the totality of these potential claimants would give rise to potentially hundreds of claims against the City. In support, Mr. Sanders identifies his own household as an example; at the time of the flood, he with lived his mother, his niece, and his nephew, who would each have individual claims for loss of property. Additionally, because the home was inherited by his mother and her five siblings, they would also have separate claims for property damage.

However, after a review of the record, we find that the class is not sufficiently numerous such that joinder would be impractical. Mr. Sanders failed to present sufficient evidence to satisfy the numerosity requirement of La. C. C. P. art 591(A). Although Mr. Sanders was not required to present evidence of the exact and actual number of persons who will come forward with a claim in this matter, he was required to show that the class was so numerous that joinder of all potential class members is impractical. Instead, he merely alleged in his petition that the class would potentially contain "in excess of one hundred properties, as well as the number of people connected with each property via ownership, residency, etc." However, no evidence was produced in court to show the population of this area, how many permanent residents existed at the time of the rainstorm, or how many people actually suffered damage. Numerosity is not satisfied by merely alleging that a large number of potential claims exist; it is pertinent that the party seeking certification "show that joinder is impracticable and there is a definable group of aggrieved persons." *Doe v. Southern Gyms, LLC, supra.*

In support of certification, Mr. Sanders presented the following documentation: 1) Mr. Vanderbrook's expert report, 2) Mr. Boudreaux's

17

assessment of the drainage system for the City, and 3) Mr. Sanders's deposition testimony. Mr. Vanderbrook's report however, only referenced that the area was densely populated; it did not provide an exact or even estimated figure as to the number of individuals within in the area. Moreover, the report did not provide even a rough estimation of the number of potentially aggrieved persons in connection with this matter. Mr. Boudreaux's assessment also provided that the area encompassed by the drainage system was densely populated. However, this assessment was produced for the City in 2013, four year prior to the rainstorm, and the findings of the assessment itself were based on the population of the City from the year 2000.

Arguably, the size of the population for this area has changed; there has either been an increase or decrease in population size since the census was compiled and the report issued. No accurate number, or even an estimation, as to the number of aggrieved persons could be determined from either report as to the potentially aggrieved persons. Instead, only a speculation as to the size of the area itself, not the number of aggrieved persons, could be made. The argument that because the area encompassed by the drainage system is densely populated, "in excess of a hundred homes," and will likely lead to several claims, alone, is insufficient to establish numerosity.

In his deposition Mr. Sanders recalled that at least ten homes and an apartment complex received interior water damage, resulting in damage not only to the property itself, but also to personal effects. He also recalled at least five others, including himself, who either lost or received damage to their vehicles. However, we find that this is insufficient to establish that a

18

sufficient number of individuals existed such that joinder would be impractical. Specifically, Mr. Sanders argued that the area was densely populated in excess of hundreds of homes; yet he could only recall ten homes that experienced water damage and a few others with damage to personal property. No evidence as to the damage itself was presented. Mr. Sanders stated that he had a Facebook page of pictures of the damage that the area sustained from different homes, however, none of the pictures were produced to demonstrate that several individuals were actually aggrieved.

Although Mr. Sanders stated that at one point he canvassed the neighborhood and counted the number of homes impacted, he could not recall the exact number. He also stated that after this storm, through the help of a local church, he was able to compile a list of those in the area who were impacted by the storm. Mr. Sanders also stated that he had a meeting with those in the aggrieved area, where he then collected the names, addresses, phone numbers, and requested pictures of damage and produced a copy of the list to the mayor's office. Although Mr. Sanders stated that he kept a copy of this list, it was never offered into evidence, or even indicated the number of people on the list.

Additionally, Mr. Sanders stated that during a previous flood, FEMA or another similar agency came to the area to aid those in need by providing cleaning supplies and other necessities and that a reporter covered a story of the event. However, neither the story of the incident, nor any information that the emergency organization collected was introduced to attest to the number of potentially aggrieved persons in this area. Moreover, even if Mr. Sanders established that a large number of persons could be established, the law has

19

provided that where there is a large number of potential class members but few have indicated a dissatisfaction with the defendant or a desire to assert a claim, this may be weighed against a finding that the claims are so numerous that their joinder would be impactable. *Doe v. Southern Gyms, LLC, supra; Pulver v. 1ˢᵗ Lake Props*., 96-248 (La. App. 5 Cir. 9/18/96), 681 So. 2d 965. Here, there are simply not enough individuals who expressed a dissatisfaction with the City or a desire to file suit as a result of this event. Mr. Sanders has not presented any evidence that there is, in fact, a large number of dissatisfied persons that have come forward since the flood on April 30, 2017, or since the filing of Mr. Sanders' original petition who expressed a desire to pursue a claim for damages by filing a separate suit or claims.

Mr. Sanders stated in his deposition that he went around the neighborhood and spoke with several people who had interior water damage from the storm. He stated, "I just asked them did they sustain any damages due to the flood. Did they get any water in their house[?] Some of them was like yeah, let me show you where water was at or let me show you the waterline in my house." He did not testify whether those persons, or if any of the persons from the meeting he held, were interested in pursuing claims or seeking redress for damages.

Mr. Sanders stated that he was able to garner a list of impacted individuals from simply walking around the neighborhood, or either driving through the area, yet, despite the ease in with which these individuals could be contacted or identified, Mr. Sanders never testified that any of these individuals were ever interested in filing a claim against the City, or that any claims had ever been filed in relation to this matter. Although Mr. Sanders's

counsel attested that he sought to represent at least twenty other individuals in this matter, neither the names of these individuals were produced, nor did they join Mr. Sanders in the filing of this action. Moreover, Mr. Sanders argued that because a single household could contain multiple claims for damage, even referencing his own as an example, we note that of the several members of his household, none have joined him as a plaintiff. Therefore, it cannot be said that a sufficient number of potential claimants existed to establish numerosity in this action.

Based on the findings of Mr. Boudreaux's report, Mr. Sanders further asserts that because the area in question encompasses most of Winnfield's poverty area, many aggrieved individuals would lack the financial resources needed to pursue a claim against the City for their individual losses. In part, Mr. Boudreaux's report indicated that ". . . [a] casual ride throughout this neighborhood would reveal that the 75% threshold for low to moderate income. . . would easily be achievable." Based on this section of the assessment and his own personal knowledge of the area, the trial court took notice of the poverty in this particular area in determining that that numerosity should be satisfied.

We recognize that the financial resources of potential class members is an important factor in "determining whether to maintain a class action because not all potential class members may have the financial resources to pursue individual claims for damages." *Bagot v. James Holdings, LLC*, 17-121 (La. App. 5 Cir. 12/20/17), 235 So. 3d 1330, *writ denied*, 2018-0124 (La. 3/9/18), 238 So. 3d 451. However, "a plaintiff's financial ability concerning tort claims is usually cured by the fact that these actions can feasibly be

21

undertaken on a contingency basis." *Doe v. Univ. Healthcare Sys., LLC*, 13-1457 (La. App. 4 Cir. 7/09/14), 145 So. 3d 557. Accordingly, we conclude that Mr. Sanders failed to establish that the class was sufficiently numerous to satisfy the requirements of class certification.

Because we find that Mr. Sanders failed to satisfy the numerosity requirement of La. C. C. P. art 591, there is no need to address the remaining requirements for class certification because the "consideration of numerosity alone is sufficient to establish that class action certification should be denied." *Galjour v. Bank One Equity Investors-Bidco, Inc.*, *supra*. Thus, whether the remaining criteria for class certification are met is rendered moot. *Reeves v. Explo Systems, Inc*.

## CONCLUSION

For the reasons stated above, we find that the trial court erred in determining that the prerequisites for class certification under La. C. C. P. art. 591 were satisfied. The judgment of the trial court is reversed. Costs in this matter are assessed to the Appellees.

**REVERSED.**

22